# Exhibit 48



**TRANSLATION**

# SUPREME COURT JUDGMENT

## delivered Monday, 20 November 2023

**Case no. BS-20331/2022-HJR**
(1st division)

The Danish Customs and Tax Administration
(Attorneys Boris Frederiksen and Steffen Sværke)

v.

Bech-Bruun I/S
(Attorneys Ole Spiermann and Jakob Lentz)

Judgment in the case was previously delivered by the Eastern High Court, 12th division on 28 April 2022 (BS-26436/2020-OLR).

The case was heard by five judges: Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen og Mohammad Ahsan.

**Claims**

The Appellant, the Danish Customs and Tax Administration, has claimed (1) that the Respondent, Bech-Bruun I/S, be ordered to pay DKK 705,821,108.92 plus interest from 28 September 2023; that (2) Bech-Bruun be ordered to pay DKK 446,605,946.27; and that (3) Bech-Bruun be ordered to pay DKK 201,954,297.55.

The Danish Customs and Tax Administration has further claimed that (4) Bech-Bruun be ordered to reimburse DKK 6,189,953.70, paid by the Danish Customs and Tax Administration in compliance with the High Court's judgment, plus statutory interest from 24 May 2022.

The Danish Customs and Tax Administration has claimed, in the alternative, that Bech-Bruun be ordered to admit liability with respect to the advice provided to North Channel Bank. In the further alternative, that Bech-Bruun be ordered to admit liability for the loss incurred by the Danish Customs and Tax Administration as a result of applications for refund of dividend tax in the period 12 May 2014 to 22 July 2015, based on Credit Advice Slips issued by North Channel Bank, or, in the alternative, in a shorter period.

With respect to Claims 1-3, Bech-Bruun has pleaded affirmation, with respect to Claim 4, Bech-Bruun has denied liability, with respect to the alternative claim, Bech-Bruun has pleaded dismissal, in the alternative, denial of liability, and with respect to the further alternative claim, Bech-Bruun has denied liability.

**Supplementary particulars**

Further evidence has been provided to the Supreme Court on, inter alia, North Channel Bank's circumstances, losses, settlements, and statement of claims, as well as on SKAT's circumstances.

**Witness statements**

The Supreme Court has heard additional oral evidence given by A.

**Arguments**

The Danish Customs and Tax Administration argues, in particular, that Bech-Bruun is liable for the Danish Customs and Tax Administration's loss of DKK 1,135,775,442.18, which arose from the construction of a criminal setup by a number of pension plans, banks, financiers, payment agents, and lawyers with varying involvement, which induced SKAT (now the Danish Customs and Tax Administration) to pay out that amount. In essence, the setup was that tax-free US pension plans appeared as recipients of Danish taxed dividends based on dividend credit advice slips from a German bank, North Channel Bank, even though they had never received dividends and were thus unduly reimbursed for dividend tax.

Bech-Bruun undertook to prepare a legal opinion to the effect that North Channel Bank should not incur liability in damages or criminal liability for its participation in the setup. By providing the mentioned legal opinion, Bech-Bruun contributed to North Channel Bank's issuance of genuine but - in terms of content - incorrect dividend credit advice slips. Bech-Bruun was aware that the application for dividend tax refunds required bank documentation for receipt of dividends (dividend credit advice slips) and that North Channel Bank would issue such documentation. Bech-Bruun knew that if Bech-Bruun gave a "should opinion" to the effect that the bank would not incur liability, the bank would participate in the setup and issue dividend credit advice slips. Bech-Bruun's submission of a legal opinion with the desired conclusion was an active act on the part of Bech-Bruun. The act was culpable. Bech-Bruun could have refrained from providing the advice or could have given their legal opinion with the opposite – and thus correct – conclusion.

Bech-Bruun was given the opportunity, through a transaction diagram, to gain full insight into the model to be used for the fraud. Bech-Bruun therefore knew that North Channel Bank had full insight into what was going on. When at the same time participating as a custodian by issuing dividend credit advice slips, North Channel Bank would be liable if the applications were unlawful, regardless of whether the role of the bank was large or small.

Bech-Bruun was aware of the risk and thus the potential consequences of the advice – i.e., the losses to the Danish State – and should therefore have ensured in their advice that they did not contribute to unlawful refunds. Bech-Bruun did not live up to that obligation.

In the asset stripping cases, the courts held that the advisers of the sellers had a duty – as did the sellers - to protect the interests of the tax authorities. Bech-Bruun has that duty as well. However, unlike the asset stripping cases, Bech-Bruun was aware of the risk that the tax authorities would suffer a loss, and that was the very essence of Bech-Bruun's advice. Bech-Bruun's liability is stricter than that resulting from the asset stripping cases, since Bech-Bruun's client, North Channel Bank, is not comparable to the sellers in the asset stripping cases but the criminal buyers. Bech-Bruun advised the fraud-convicted bank.

Bech-Bruun's liability must be assessed as participatory liability (in Danish: "medvirkenansvar"). Bech-Bruun's liability must be assessed on the basis of the harmful act without including considerations of what the tortfeasor may have agreed with other operators in the setup.

Bech-Bruun was warned of the risk of double refunds and both unlawful and criminal refunds. It is extremely rare in liability cases that the tortfeasor has been that directly warned of the potential adverse effects of the acts. The e-mail of 3 February 2014 from the law firm Jones Day contained clear danger signals, although there was a reservation that a "structure paper" had not yet been seen. There is nothing in the case to support that such an e-mail should be usual. Jones Day's e-mail should have given rise to extra caution, as it appeared that Jones Day was willing to advise the bank, even though the bank knew that its customers would carry out potentially criminal transactions, double refunds, tax fraud and dividend arbitrage. Jones Day's only focus was whether the bank would risk liability in this respect and not whether fraud etc. could be avoided. This factor, which must be characterised as a warning, thus imposes stricter requirements on Bech-Bruun. Therefore, Bech-Bruun should have ensured that their advice could not be used for criminal offences since Jones Day pointed explicitly to the risk thereof.

Bech-Bruun understood that there was a risk of unlawful refunds due to cum/ex. In view of the warning and the understanding thereof, Bech-Bruun should have ensured in their advice that no possibility was created to apply for unlawful refunds, but although Bech-Bruun immediately realised the risk of unlawful refunds, it was not addressed. Bech-Bruun instead ended up approving that North Channel Bank issued dividend credit advice slips in, precisely, a cum/ex model.

Bech-Bruun accepted the use of the criminal cum/ex model, which served no legitimate purpose. Bech-Bruun could see that there was no business purpose. The only objective realised was dividend arbitrage, but the model was counterproductive to seeking dividend refunds. However, it was suitable for fraud. It made no sense to structure the trades as cum/ex if they were ordinary trades or dividend arbitrage. If so, the trades could have been carried out on usual conditions. However, it made sense if the aim was to obtain unlawful refunds. Bech-Bruun was aware that cum/ex was a derogation from normal market conditions that could be used for criminal activities. Bech-Bruun thus chose to advise on transactions with no business purpose, where strict requirements apply to the diligence of the adviser in view of the risk of abuse or criminal purposes.

Together and separately, the cum/ex model, the dividend credit advice slip without receipt of dividends, and compensation payments under stock loans were inexplicable if the aim was to create tax arbitrage. If the operators in the model had a shareholding, it would have been simple to simply transfer the shares to the pension plan, which would appear as owner, receive dividends and dividend credit advice slips and apply for a refund. The inexplicable circumstances, on the other hand, made sense if the purpose was to seek refunds without shares.

Bech-Bruun could see and accepted that two dividend credit advice slips would be issued for one dividend and that thus incorrect documentation of withholding dividend tax was issued. Bech-Bruun deliberately failed to familiarise themselves with the German transaction diagram showing the fraud model in clear text. The transaction diagram received by Bech-Bruun showed how the fraud was to be structured with accounting entries that offset each other and where dividend credit advice slips were nevertheless to be issued. Even on the surface, it was clear from the transaction diagram that the trades were pro forma, and on closer examination it appears that the "trades" took place without shares, money and thus dividends. In the light of the circumstances, Bech-Bruun had a duty to understand the model in its entirety before expressing an opinion on it, and Bech-Bruun could not in their advice choose, in agreement with the client, to disregard knowledge in the possession of Bech-Bruun.

5

Bech-Bruun should have realised that the dividend credit advice slips would be contrary to section 163 of the Criminal Code since North Channel Bank did not know whether the credit advice slip (declaration) was correct. If the constituent elements of a crime pursuant to section 163 are realised and there is also intention of enrichment, there is an imminent risk of fraud pursuant to section 279 of the Criminal Code, for which North Channel Bank has been convicted. Bech-Bruun had the information to realise this risk.

Bech-Bruun knew that North Channel Bank's dividend credit advice slips were to be used for applying for a refund of Danish dividend tax. In any event, Bech-Bruun should therefore have ensured that the pension plan was the tax owner, since North Channel Bank's dividend credit advice slips were to be used - which was known or discoverable - against the Danish tax authorities in a model of which the bank was part and had full knowledge. Bech-Bruun could see that the pension plan was not the tax owner of the dividends.

Bech-Bruun was an expert in dividend taxation and had extensive practical experience, including with foreign shareholders. Bech-Bruun's defence consists of views on limitations in their instructions, assumptions, and reservations. It is not possible to disclaim professional liability towards third parties. On the contrary, lawyers are obliged to exercise critical awareness and investigate suspicious matters before providing advice. Bech-Bruun has thus committed gross and clear faults giving rise to liability.

Bech-Bruun's legal opinion was submitted on Monday 5 May 2014. On Friday 9 May 2014, Jones Day submitted their legal opinion based on, inter alia, Bech-Bruun's legal opinion. On Monday 12 May 2014, SKAT received the first refund applications based on dividend credit advice slips from North Channel Bank. Bech-Bruun knew that the dividend credit advice slips were to result in payment of dividend refunds from the Danish treasury. North Channel Bank and the other operators involved in the fraud obviously asked for Bech-Bruun's advice because they needed it. The payment of dividend refunds is therefore an intentional consequence of the advice, and the refund is a causal consequence of that advice.

The close temporal link between Bech-Bruun's final - content-wise - legal opinion and the first unjustified refund applications with dividend credit advice slips from North Channel Bank is clear. It was a specifically worded task that Bech-Bruun's legal opinion was to be obtained. When the first positive conclusion from Bech-Bruun was available, the first preparatory actions could be initiated, and when the final advice was available, refund applications could be submitted.

Specifically, Bech-Bruun's instructions, the advisory process, the implementation of the transactions on which Bech-Bruun advised, the subsequent use of Bech-Bruun's advice, and Bech-Bruun's subsequent confirmations of the advice together and separately prove that there is a causal connection between Bech-Bruun's culpable advice of North Channel Bank and the Danish Customs and Tax Administration's loss.

The causal connection between Bech-Bruun's culpable advice and the loss incurred by the Danish Customs and Tax Administration also follows from the fact that there are no relevant differences – if any at all – in the description in Bech-Bruun's legal opinion and the transactions recorded in the accounts.

The losses of the Danish Customs and Tax Administration were a foreseeable consequence of Bech-Bruun's culpable advice. Bech-Bruun could see that refunds would be applied for on the basis of the dividend credit advice slips that Bech-Bruun approved that North Channel Bank could issue, and Bech-Bruun was not interested in the size of the applications and thus the loss of the Danish Customs and Tax Administration until a claim for damages was raised against Bech-Bruun.

It was also foreseeable for Bech-Bruun that dividend credit advice slips from North Channel Bank could be used in connection with unjustified refund applications that would result in a loss for the Danish Customs and Tax Administration if Bech-Bruun approved the setup. Whether those dividend credit advice slips would have an incorrect content because the setup was carried out with pro forma transactions or without real stock and cash flows is irrelevant, but Bech-Bruun was actually in possession of information to realise that it had to be without shares and money. Since the setup was to be completed without shares and money, the potential losses incurred by the Danish Customs and Tax Administration as a result of unjustified refund applications with dividend credit advice slips from North Channel Bank were difficult to define. It was therefore not unforeseeable for Bech-Bruun that the Danish Customs and Tax Administration's losses could be very large, and therefore Bech-Bruun cannot, on the basis of the amount of the loss, deny liability. Bech-Bruun even knew that a single refund application could involve a very large amount.

The Danish Customs and Tax Administration has proved the loss. It is common ground that the Danish Customs and Tax Administration suffered a loss of DKK 1,135,775,442.18 by paying refunds in accordance with unlawful refund applications accompanied by dividend credit advice slips from North Channel Bank. The Danish Customs and Tax Administration has reduced its claim by the payments received by the Danish Customs and Tax Administration from other tortfeasors. The reduction has taken place proportionately as the payments were received from tortfeasors who had contributed to both the North Channel Bank part and to other unlawful refund applications. The principal amount is thereafter DKK 705,821,108.92.

The damage was caused by North Channel Bank, Bech-Bruun and others who have contributed to the unlawful refund applications. Where there are several tortfeasors who are all liable for a loss, they incur joint and several liability, whereupon the injured party can choose at its own discretion which tortfeasor to pursue.

Bech-Bruun argues that their liability must lapse as a result of the Danish Customs and Tax Administration's contributory negligence and assumption of risk. This is for Bech-Bruun to prove, which they have failed to do.

The Danish Customs and Tax Administration has been the victim of a particularly serious fraud, in which a group of bankers and financiers coordinated an international, complex, and extensive fraud setup. This fraud cannot be blamed on the Danish Customs and Tax Administration. It can only be blamed on the people, businesses and advisers who participated and advised. No one at the Danish Customs and Tax Administration was aware of any fraud in the dividend case.

The assumption of risk argument does not make sense. The fact that there is a risk of unlawful refund applications is a basic condition that SKAT shares with everyone else who pays out money. This is particularly true in fields of mass administration, such as VAT and social services. Moreover, there are risks associated with all parts of the tax administration, and the allocation of resources is a matter of priority – not an assumption of risk.

SKAT's administration of the field of dividend refunds was in accordance with the legal basis. The underlying financial system, on which SKAT's control of refunds was based, is simple and standardised, especially in the case of listed companies. The robustness of the system is further confirmed by the complexity of the setup the fraudsters in the Danish dividend case had to establish in order to succeed with the fraud.

SKAT carried out both procedural and substantive checks before payment was made. It has thus been established that the "necessary information and required sub-annexes and documentation" exist and that "rates and calculations" are correct. In that regard, it is also verified that "the information is plausible" since it has been declared to be so by a foreign tax authority and an independent credible party – a bank.

On 16 June 2015, the Anti-Fraud Unit (Særlig Kontrol) of SKAT received a notification of suspected fraud with the refund of dividend tax. There were no grounds for suspending all payments in this area at that time in June 2015. The submissions mentioned "a suspected fraud" of up to DKK 500 million, and they did not contain any concrete evidence. Only with the information provided by the UK tax authorities could the information from the first notification be confirmed to the extent that it could be assessed whether there were sufficient

grounds for action. On 6 August 2015, the same day on which SKAT received the information from the UK tax authorities, the refund payments were stopped.

The Danish Customs and Tax Administration claims are not time-barred. The limitation period was suspended until the Danish Customs and Tax Administration received sufficient factual information to assess that there was a basis for instituting proceedings against Bech-Bruun, see section 3(2) of the Danish Limitation Act. Such factual information was received by the Danish Customs and Tax Administration on 29 June 2018 at the earliest, when the Danish Customs and Tax Administration received Bech-Bruun's legal opinion. Since the proceedings were instituted less than three years from that date, the claim is not time-barred.

The e-mail of 10 October 2016 from the Finanzamt für Steuerstrafsachen und Steuerfahndung Wuppertal to the Danish Customs and Tax Administration did not give rise to investigations against Bech-Bruun, with the consequence that the Danish Customs and Tax Administration at an – unknown – time in the following period "should have become aware" of the liability claim against Bech-Bruun. The e-mail did not provide a basis for the Danish Customs and Tax Administration to raise a claim for damages against Bech-Bruun.

In any event, even if there were an extended duty of investigation, it cannot imply that the Danish Customs and Tax Administration should have obtained insight into Bech-Bruun's advice prior to 8 June 2017. The occurrence of a duty of investigation does not terminate the suspension period. The suspension period only ends when the creditor received or should have received sufficient information to assess the claim. The suspension ends only if the creditor's ignorance can be blamed on the creditor. It can therefore never be at the time of the commencement of a duty of investigation, if any.

In accordance with section 3(5) of the Danish Interest Act, the Danish Customs and Tax Administration's claim accrues interest from the time of payout since the damage is caused by unlawful conduct and the Danish Customs and Tax Administration has been prevented from raising the claim at an earlier stage.

If the Supreme Court finds that the claim cannot be quantified on the present basis, Bech-Bruun must be ordered to admit liability in accordance with the Danish Customs and Tax Administration's alternative or further alternative claim.

Bech-Bruun argues, in particular, that there is no basis of liability. In circumstances such as those in the present case, where a lawyer was undisputedly unaware of the client's fraud, liability towards third parties requires, in accordance with the case-law, at least that the lawyer has been specifically involved and committed a manifest error of a certain seriousness on which the lawyer can be

blamed to the extent that the lawyer must bear the loss. These basic conditions for breach of the liability standard are in no way fulfilled.

A legal opinion is a legal assessment of a given fact provided to a client. The client's purpose of a legal opinion is to uncover a legal risk, and the lawyer will in his or her legal opinion make every effort not to comment on anything other than the fact presented, or to assume other risk than necessary according to the lawyer's instructions. The facts in a legal opinion are determined together with the client, to which is added assumptions and qualifications, which are also agreed with the client. The facts and assumptions are neither checked nor verified. In general, lawyers' liability towards third parties requires something special, and this applies in particular to a legal opinion which, according to its content, can only be relied on by the client.

Bech-Bruun's legal opinion of 4 August 2014 was intended to assess the "consequences to NCB in terms of liability of acting as a custodian" under Danish law. The subject-matter was a hypothetical situation designed to assess the bank's risks on the basis of specified assumptions and reservations. Such a risk assessment is a typical example of the scope of legal opinions, and it is quite common in a risk assessment to include "worst case". In the legal opinion, Bech-Bruun did not comment on whether the bank's customer would comply with the tax conditions for the refund of dividend tax. On the contrary, the legal risks assessed by Bech-Bruun were based on the hypothetical situation that SKAT might subsequently find that the conditions of Danish tax law were not met, including not least the condition of lawful ownership. In order to establish a basis of liability, it would be necessary, but not sufficient, that Bech-Bruun, when preparing the legal opinion, should have realised that North Channel Bank would commit fraud. There is no basis for that.

The assessment of the basis of liability must be based on Bech-Bruun's instructions. The instructions concerned a legal opinion, and it was stated that "the question to be answered in my opinion is whether, from a Danish tax law perspective, the client can be held liable or even prosecuted for supporting/facilitating tax evasion committed by one of the other operators in this transaction (which was why we requested the Danish tax opinion)". The concern was thus on the fulfilment of the general conditions for refund of dividend tax and did not relate to the bank but to the bank's customer and transaction.

As the situation was presented to Bech-Bruun, there was a legitimate need for advice, and it was fully justified for Bech-Bruun to undertake the engagement. Any other Danish law firm with the necessary skills would have done the same. Bech-Bruun naturally assumed, in accordance with Bjørnholm's tax opinion and like Jones Day, that there would be shares and that dividends would be received after withholding of dividend tax. The fact that A was not aware of any

business purpose other than the customer's tax benefit and that the bank's customer thus apparently engaged in dividend arbitrage did not change anything.

The Danish Customs and Tax Administration attaches great importance to the German transaction overview, which, according to the Danish Customs and Tax Administration, was supposed to show that the transaction consisted of only three parties and would be circular. However, A was unable to understand the German transaction summary and it was omitted after the engagement of advisory services and, under the responsibility of Jones Day, was replaced by the English transaction description.

Bech-Bruun concluded in the legal opinion that "NCB should not be subject to Danish civil liability, entailing an obligation to compensate the Danish State for any losses resulting from the bank's role in the contemplated transaction" and that "NCB should not be subject to Danish criminal liability as a result of its role in the contemplated transaction". It was thus a so-called "should" opinion, since the use of the word "should" indicated a certain degree of uncertainty in the assessment and, consequently, a certain risk. It is clear that Bech-Bruun did not verify, let alone "give the seal of approval", of the transaction description or assumptions. In addition, three explicit reservations were formulated in relation to the conclusion on liability.

In its arguments in the present case, the Danish Customs and Tax Administration seeks to disregard those facts and to reverse the firm understanding of legal opinions. The argument is based on unfamiliar constructions that a lawyer who gives a legal opinion should be required to verify the facts and assumptions, and the lawyer should not be able to make reservations, in particular in relation to third parties.

The three reservations and the legal opinion in its entirety leave no doubt as to how Bech-Bruun would have assessed a situation in which North Channel Bank's customers would not own any shares at all, so that there would be fraud. From the outset, A had made it clear that dividend tax could not be refunded more than once. He was later given the opportunity to emphasise that the bank's customer could not seek refund of dividend tax without ownership of shares entitled to dividends at the time of distribution.

It is disputed that "T+3" was market practice. There are no grounds for arguing that deviation from this or other alleged market conditions was unusual or unfounded, let alone suspicious, nor would any suspicion concern the bank as a custodian. As regards, in particular, the "cum/ex" and the comparisons to Germany made by the Danish Customs and Tax Administration, the tax authorities have generally stated that the case was not similar to the previous events in Germany.

Liability issues in case of fraud by others sometimes present themselves to accountants, and the Supreme Court has shown restraint in imposing liability, see e.g. the Supreme Court case in UfR 2014.1346 H.

The case-law on the asset stripping cases shows that positive knowledge of a transfer which is not a normal commercial transaction and which includes significant "additional proceeds" does not in itself justify liability under Danish law's general rules on damages. This requires further concrete participation of a certain materiality (participation). Unlike the asset stripping case, Bech-Bruun did not recommend to customers in North Channel Bank to complete transactions, nor had Bech-Bruun any dialogue with the bank, and certainly not the bank's customers. Bech-Bruun also did not assist in carrying out specific transactions, and Bech-Bruun had no role with regard to the specific applications that caused losses to SKAT.

In the present case, there is no basis for a stricter standard of liability. That bank customers' participation in dividend arbitrage should justify a tightening of the liability standard cannot apply to the lawyer who, in accordance with his or her instructions, gives a legal opinion to the bank about the bank's legal position, as opposed to the bank's customers' legal position. In the case of a lawyer advising a bank, it cannot justify a tightening of the liability standard that another bank may also, as the case may be, issue a credit advice slip in respect of the same dividends. On the contrary, it must be common, especially in the case of compensation payments. Furthermore, the legal opinion concerned the hypothetical situation that SKAT would subsequently find that the bank's customer was not entitled to a refund of dividend tax and where it would be expected that another customer of another bank could be entitled to it.

The recommendations in the November 2014 report of the Danish Ministry of Taxation on enhanced advisory and industry cooperation to counter cross-border tax evasion – several of which with effect from July 2019 are reflected in new provisions of the Code of Legal Ethics – would not give rise to criticism of Bech-Bruun, even if they had been available earlier and even if Bech-Bruun had specifically provided tax advice.

Bech-Bruun cannot incur joint and several liability with criminal persons and companies who have acted specifically and intentionally in a fraud.

The fictitious transactions in North Channel Bank were in direct contradiction with Bech-Bruun's legal opinion on numerous points, including explicit assumptions and reservations.

There is neither causal connection, nor foreseeability. The fraud involving the deliberate issuance of incorrect credit advice slips was ongoing before Jones Day and Bech-Bruun gave their legal opinions. There is every reason to believe

that the fraud would have been committed even in the absence of those legal opinions. The only possible use of the legal opinions was for audit and for the authorities in Germany, which did not, however, require legal opinions and which, moreover, would not inquire until long after dividend credit advice slips had been issued to customers.

The Danish Customs and Tax Administration bears the burden of proof of causal connection. Causality basically requires that North Channel Bank would not have committed fraud in the absence of Bech-Bruun's legal opinion. There is not the slightest evidentiary support for this.

If North Channel Bank had theoretically regarded one or more legal opinions as having an impact on the bank's intention to commit fraud by recording fictitious movements of shares and money and the deliberate issuing of false credit advice slips, the bank would have made sure to have the legal opinions of Jones Day and Bech-Bruun ready beforehand and in their final and signed version. This did not happen. Final legal opinions were only requested in July 2014 and issued only in August and September 2014.

The possible use of the legal opinions had to do with the bank's regulatory situation in Germany. Bech-Bruun's legal opinion was not to and could not be used in Denmark. With regard to Germany, there is no evidence that Jones Day's or Bech-Bruun's legal opinions were used internally in North Channel Bank as a basis for decisions or otherwise. Any external use towards, for example, an authority, required completion and signature. The drafts of 2 May and 9 May 2014 (on Danish, German and Belgian law) did not constitute advice for which a lawyer may incur liability. It is true that the drafts of 2 May and 9 May 2014 were prepared prior to the submission of the refund applications to SKAT in Denmark, but not prior to registrations and the issuance of dividend credit advice slips in Germany. This is a decisive point as the registration and issuance of dividend credit advice slips involved the bank, while applications for refund of dividend tax did not. In fact, the dividend credit advice slips had left the bank well before the applications for refund were submitted, and the dividend credit advice slips were subsequently subject to the control of others. It is true that the legal opinion drafts of February 2014 preceded, also, registrations and the issuance of dividend credit advice slips in Germany, but this does not justify a causal connection. The drafts constituted even less than the May drafts for which a lawyer could be held liable.

The alleged loss is not a foreseeable consequence of Bech-Bruun's legal opinion. Essentially, Bech-Bruun's submission of a legal opinion to North Channel Bank did not increase the danger or risk associated with SKAT's management of applications for refund of dividend tax.

It was not foreseeable for Bech-Bruun that the customer in North Channel Bank would enter into a "transaction" that was not compatible with the transaction description in Bech-Bruun's legal opinion, or that the bank would take on a role other than as a custodian, let alone that the bank would commit fraud by recording fictitious movements of shares and money and intentionally issue incorrect credit advice slips.

Nor was it foreseeable that the refunds concerned alleged shareholdings, which were both enormous and unrealistic, both in terms of the nature of pension plans and the nature of North Channel Bank.

A potential claim is forfeited by time-barring. The limitation period must be calculated no later than from 10 October 2016, when SKAT was informed by the German authorities that Bech-Bruun had issued a "declaration" that a German bank involved in the "dividend" case as custodian bank had acted "legally". If SKAT had at that time legally believed that there could be a basis of liability for a Danish adviser, SKAT received the factual basis with the e-mail. The only German bank to appear in the "dividend case" was North Channel Bank, and the volumes reported in the e-mail corresponded to the dividend credit advice slips issued by that bank, which SKAT itself had collected and analysed. This had led to a police report against the bank in August 2016, which was shortly before receipt of the e-mail of 10 October 2016. At the time when legal proceedings were instituted in June 2020, the claim was thus time-barred.

The Danish Customs and Tax Administration bears the burden of proving the suspension of the limitation period, and the burden of proof has not been discharged by the Danish Customs and Tax Administration.

It is inherent in the 3-year limitation period that the creditor may have work to perform while the limitation period runs. Thus, the limitation period does not run until the claimant has a full overview of the proceedings or comes into possession of a certificate to which the claimant attaches particular importance.

There is assumption of risk and contributory negligence. In 2007, SKAT and the Danish Ministry of Taxation deliberately chose not to carry out any substantive control of applications for refund of dividend tax, and this choice was maintained, notwithstanding the fact that in 2012 the Danish Ministry of Taxation informed the Danish Parliament (Folketinget) to the contrary, and despite the fact that from 2012 to 2015 SKAT paid out ever-increasing billions on the basis of applications from unknown US pension plans. It came as a surprise to everyone, and of course also to Bech-Bruun, that this was fraud. SKAT could and should have discovered that the applications for refunds submitted in 2014 accompanied by dividend credit advice slips issued by North Channel Bank were

unusual. SKAT should have discovered very quickly that something was seriously wrong.

The assumption of risk by SKAT does not prevent the Danish Customs and Tax Administration from bringing claims against the persons who intentionally committed or contributed to fraud, but it excludes claims for damages against Bech-Bruun.

The management in the field of dividends has been irresponsible, which can be attributed to SKAT (now the Danish Customs and Tax Administration) as contributory negligence. It was a direct consequence of the irresponsible management that refunds were paid in accordance with applications attached to credit advice slips from North Channel Bank, and it would be unacceptable to require Bech-Bruun to bear the consequences thereof. In a case such as the present, where the authority is the claimant, it is irrelevant that public-law control obligations do not, in principle, seek to protect taxpayers or advisers. The possibility of the Danish Customs and Tax Administration to prioritise resources does not entitle to saving all resources and thereby delegating the required control to private advisers.

Furthermore, it is an expression of contributory negligence that SKAT did not suspend the processing of applications for refund of dividend tax until 6 August 2015, even though SKAT already received the first notification from a Danish tax attorney on the suspected fraud on 16 June 2015.

SKAT has suffered no loss. It is not disputed that SKAT unjustifiably paid a total of DKK 1,135,775,442 in refunds of dividend tax on the basis of applications attached to dividend credit advice slips issued by North Channel Bank. A statement of loss must be limited to the relevant period, which means that notes for a total of at least DKK 600,228,186 must be disregarded, and payments received from others must be deducted. The Danish Customs and Tax Administration has stated that it has received DKK 1,010,424,596.73 under the secret settlement agreement of May 2019 with, among others, the bank's owners and customers, but despite orders for disclosure of documents, the Danish Customs and Tax Administration has failed to document which payments should be allocated to dividend credit advice slips issued by North Channel Bank. The Danish Customs and Tax Administration cannot excuse itself by any self-created insufficiency of evidence, and a loss has not been established.

It follows from the general law of obligations that, in the case of multiple claims, each with their own tortfeasors, and where an injured party receives partial payments from some tortfeasors, the injured party is obliged to allocate the payments to the claims to which the payments relate.

There is nothing to prevent the total payment under the settlement agreement of DKK 1,010,424,596.73 to come from the parties to the settlement responsible for the "NCB share". Without proof of whether the payments received relate to the "NCB share", there is no other option than to deduct the full payment from the claim against Bech-Bruun.

In addition, the Danish Customs and Tax Administration has failed to comply with its obligation to mitigate the loss and is also for that reason prevented from making claims against Bech-Bruun. Recovery of the sums wrongly paid out by the tax authorities must in its entirety precede a claim for damages against Bech-Bruun, and a claim against Bech-Bruun must require the Danish Customs and Tax Administration to prove that recovery has not been possible.

The Danish Customs and Tax Administration's most unusual interest claim is disputed in its entirety. On the contrary, in a case such as the present, an interest claim must be extinguished or, in the alternative, the interest rate must be reduced, see sections 3(5) and 5(3) of the Danish Interest Act. In any case, there is no basis for interest on any claim for compensation from a date earlier than the commencement of proceedings, see section 3(4).

**The Supreme Court's reasoning and conclusions**

*1. Background and issues of the case*
In 2014, Bech-Bruun I/S advised the German bank, North Channel Bank, on the bank's potential liability in participating in transactions involving Danish quoted shares. The transactions involved the issuance by North Channel Bank of dividend credit advice slips which could be used for submitting applications to SKAT (now the Danish Customs and Tax Administration) for dividend tax refunds.

During 2014 and 2015, North Channel Bank issued dividend credit advice slips which, in the period from 12 May 2014 to 22 July 2015, were appended by so-called reclaim agents to applications to SKAT for refund of dividend tax to US pension plans, which had a favourable dividend tax position due to the double taxation agreement between the United States and Denmark. On the basis of the applications received, SKAT paid out a total of DKK 1,135,775,442.18. The refund applications were subsequently found to be unjustified. In this connection, the parties agree that the refund applications were based on fictitious transactions, since there were no shares, dividends, or cash flows.

On 23 September 2019, North Channel Bank accepted a fine of DKK 110 million before the Court of Glostrup for aggravated fraud. By accepting the fine, North Channel Bank admitted, in the period 2014-2015, to have registered fictitious stock and cash movements and to have issued dividend credit advice slips containing incorrect information about the payment of dividends on Danish shares

and used by the bank's co-perpetrators on behalf of US pension plans to unjustifiably receive no less than DKK 1.1 billion from the Danish tax authorities. The bank thereby obtained unjust enrichment of not less than DKK 55 million.

The main question in the case is whether Bech-Bruun, on the basis of the advice provided to North Channel Bank, is liable for the loss suffered by the Danish Customs and Tax Administration as a result of the unjustified refunds of dividend tax.

The case concerns an amount of just over DKK 700 million plus interest, as the Danish Customs and Tax Administration has reduced the claim of approximately DKK 1.135 billion by payments received through settlements with various operators who have participated in the submission of unjustified refund applications, including refunds based on dividend credit advice slips issued by North Channel Bank.

During the proceedings, questions have been raised about the basis of liability, causation, reasonable foreseeability, statement of loss, contributory negligence and assumption of risk, time-barring, and interest.

*2. The assessment of liability in general*

In the assessment of whether a lawyer, in the advice given to a client, has committed an actionable wrong against the tax authorities, the decisive point is whether the lawyer has recklessly disregarded the interests of the tax authorities. Whether that is the case depends on an overall assessment of the circumstances at the time of the lawyer's advice.

A key element of such assessment is whether the transactions on which the lawyer has advised had a business purpose and whether the transactions were unusual in nature.

In addition, the specific elements of the lawyer's engagement and the advice provided by the lawyer in the individual case are included in the assessment.

*3. The specific assessment of liability*
*3.1. The advisory process*
On 3 February 2014, the law firm Jones Day in Germany contacted Bech-Bruun by e-mail. A Danish translation of the e-mail indicates, inter alia, *that* North Channel Bank was not itself to be a party to the transaction in question, but only to provide services; *that* the parties to the transaction "will realise tax benefits in Denmark, which presumably consist in a double refund of dividend tax withheld"; *that* North Channel Bank was concerned about any "problems" in Denmark that they should be aware of, such as "tax fraud"; and *that*, until recently, there had been loopholes in German tax legislation which offered the opportunity of a double refund, but that the German tax authorities "are now

investigating these transactions and trying to claim that they are abusive exploitation or even criminal offences". It follows from a reply on the same day to the law firm Jones Day from lawyer A, who was in charge of Bech-Bruun's advice to North Channel Bank, *that* transactions such as those described "may involve the possibility for two shareholders to apply for a refund of the same withholding tax... ("cum/ex transactions")"; and *that* such transactions are "generally problematic from a legal perspective and, most often, it is not possible to provide the kind of opinion on legal and liability issues that the parties involved normally apply for".

On 5 February 2014, Jones Day stated that North Channel Bank would like a fee offer, and that its role "will be limited to providing custodian services to the parties to the cum/ex transaction". To this Bech-Bruun replied on the same day that the fee would be around EUR 6,000 – 7,000, and that "these structures are typically problematic under Danish law".

On 6 February 2014, Jones Day asked Bech-Bruun whether a legal opinion could be a reasoned "should opinion", "(i.e., "NCB [North Channel Bank] should not be subject to criminal proceedings, etc.") with certain reasonable assumptions (e.g. acting in good faith, relying on an expert opinion, no participation in – potentially – unjustified tax benefits, etc.) and reservations (no precedent/case law, etc.)". In a reply of 7 February 2014, Bech-Bruun repeated *that* the transaction in question is "problematic from a Danish legal point of view"; *that* "should level cannot be promised"; and *that* "In order to make this assessment, we must have a full overview of the transaction and the client's role, including what takes place in Denmark".

In the following days, there was further e-mail exchange between Jones Day and Bech-Bruun on the basis, inter alia, of a "tax opinion" of 27 June 2012, which Bech-Bruun received on 10 February 2014. The "tax opinion" had been prepared by, among others, lawyer B and concerned the issue of the tax consequences in Denmark for a US pension plan's participation in transactions with Danish listed shares. Jones Day's e-mail of 13 February 2014 states, inter alia, *that* the law firm does not need a "reconfirmation... from a tax perspective, but a reasoned tax analysis of the risk to which our client may be exposed if they act as a custodian in this project"; and *that* the relevant question is whether North Channel Bank under Danish tax law "can be held liable or even prosecuted for supporting/facilitating tax evasion committed by one of the other operators in this transaction...".

The dialogue between Bech-Bruun and Jones Day thereafter continued, and on 10 April 2014, Bech-Bruun received a transaction diagram prepared in German. On 15 April 2014, Bech-Bruun received a summary in English of the contemplated transactions and on 22 April 2014 a revised summary in English. Following receipt of the first summary in English, Bech-Bruun wrote to Jones Day on

16 April 2014, *that* the new "factual description" had been read; *that* "there is actually an indication that the transaction is a cum/ex transaction, which was our initial concern, but which we felt we could exclude after having read the tax opinion"; and *that* the new factual description "seems ... in any case, to exclude the possibility of retaining premise 5 in our draft opinion, since USPF [US pension plan] acquires cum dividend shares from a Seller who does not own (or deliver) cum dividend shares, and therefore USPF cannot, by definition, be the owner of cum dividend shares at the date of the dividend approval".

During the advisory process, Bech-Bruun submitted several legal opinion drafts. Bech-Bruun issued the first legal opinion draft on 18 February 2014, the second draft on 20 February 2014, the third draft on 15 April 2014, the fourth draft on 23 April 2014 and the fifth draft on 2 May 2014.

The fifth draft states in section 2 ("Scope") in a Danish translation of the legal opinion that it concerns [translated back to English] "whether NCB is liable to tax in Denmark, NCB's civil liability for a loss suffered by the Danish State, and Danish criminal law issues for NCB as a result of the transaction...".

Section 3 ("Contemplated transactions") describes the contemplated transactions in the form of purchase, sale and loan of shares and North Channel Bank's issuance of dividend credit advice slips.

The conclusion in section 5 ("Opinion") states, inter alia, *that* "NCB should not be subject to Danish civil liability, entailing an obligation to compensate the Danish State for any losses resulting from the bank's role in the contemplated transaction", but *that* a number of specified circumstances "prevent us from reaching a more definitive assessment of NCB's position". Section 5 also states that "NCB should not be subject to Danish criminal liability as a result of its role in the contemplated transaction".

On 4 August 2014, Bech-Bruun sent a signed legal opinion to Jones Day, which essentially corresponded to the fifth draft of 2 May 2014.

*3.2. The assessment of liability*
The Supreme Court finds that, based on the dialogue with Jones Day, the content of the German transaction chart, the summaries in English of the contemplated transactions and the transaction descriptions in the legal opinion, lawyer A must have realised that there was an obvious risk that North Channel Bank, together with others, was involved in drawing up a model for unjustified refund of dividend tax.

In this connection, the Supreme Court has taken into account that, already after Jones Day's e-mail of 3 February 2014 where lawyer A was made aware of the risk of a double refund of dividend tax, he had a particular reason to be vigilant

to the risk of disregarding the interests of the tax authorities in connection with the application for unjustified refunds. Further attention was needed because of the transaction descriptions that he subsequently received during the advisory process. Lawyer A was thus in an increased liability environment (in Danish "skærpet ansvarsmiljø").

Furthermore, the Supreme Court has taken into account that the contemplated transactions – which were part of a so-called cum/ex model – appeared without commercial justification.

Lawyer A had repeatedly expressed his concern during the advisory process that the transaction model appeared as a cum/ex model and that the model was generally problematic. Nevertheless, according to his testimony, he failed to familiarise himself with the content of the German transaction diagram. In addition, he knew that a dividend credit advice slip constituted an important document as the basis for a refund of dividend tax.

Since, as stated above, lawyer A must have realised that there was an obvious risk that North Channel Bank, together with others, was involved in drawing up a model for unjustified refund of dividend tax, he has recklessly disregarded the interests of the tax authorities by advising the bank as done, including by stating in his legal opinion that the bank "should not be subject" to civil or criminal liability for its participation. Lawyer A has thus committed an actionable wrong against the Danish Customs and Tax Administration.

In the circumstances of the present case, it cannot lead to a different assessment that Lawyer A had included a number of assumptions and reservations in his legal opinion.

Nor can it lead to a different assessment that the model for unjustified dividend tax refunds which was the subject of lawyer A's advice was applied without the use of shares or dividends.

*4. Causation*

Bech-Bruun argues, inter alia, that the fraud committed would have been carried out even in the absence of Bech-Bruun's legal opinion and that, therefore, there is no causal connection between Bech-Bruun's advice and the loss suffered by the Danish Customs and Tax Administration as a consequence of the unjustified refund of dividend tax.

In assessing whether there is a causal connection, the Supreme Court finds, for the reasons stated by the High Court, that the contents of Bech-Bruun's advice had already been determined on 5 May 2014, when Jones Day forwarded Bech-Bruun's legal opinion of 2 May 2014 to North Channel Bank. The bank received Jones Day's legal opinion on 9 May 2014. The first refund applications attached

to the bank's dividend credit advice slips were submitted to SKAT on 12 May 2014. There is thus a close temporal link between Bech-Bruun's submission of the legal opinion on 5 May 2014 and the submission of the first unjustified re-fund applications.

Against this background, the Supreme Court finds it to be established that the requisite causal connection exists between Bech-Bruun's culpable advice and the fact that the Danish Customs and Tax Administration has suffered a loss as a result of unjustified refund of dividend tax.

*5. Reasonable foreseeability / remoteness*

In assessing whether Bech-Bruun's liability should be limited based on remote-ness of damage considerations, it must be taken into account, on the one hand, that, as mentioned above, Bech-Bruun must have realised that there was an ob-vious risk that North Channel Bank, together with others, was involved in pre-paring a model for unjustified refund of dividend tax.

Bech-Bruun thus knew that the bank was actively involved in the preparation of the model, and Bech-Bruun must have realised that there was an obvious risk that the bank was not acting in good faith. Notwithstanding this, Bech-Bruun stated in their legal opinion that the bank "should not be subject" to civil or criminal liability for its participation.

On the other hand, it must be taken into account that the unjustified refund of dividend tax on the basis of dividend credit advice slips issued by North Channel Bank took place by the recording of fictitious transactions so that the amount of the Danish Customs and Tax Administration's losses was inde-pendent of real shares and dividends.

The Supreme Court thus finds that Bech-Bruun's liability cannot include the full amount of DKK 705,821,108.92 as stated in the Danish Customs and Tax Administration's Claim 1, see further in section 8 below.

*6. The Danish Customs and Tax Administration's loss*

Bech-Bruun has objected to the Danish Customs and Tax Administration's statement of loss, including that it has been prepared without regard to what was paid by the pension plans, whose refund applications were based on divi-dend credit advice slips issued by North Channel Bank, as a result of the settle-ment entered into on 28 May 2019 between the Danish Customs and Tax Ad-ministration, on the one hand, and a large number of pension plans and other operators which participated in the unjustified refund applications, on the other.

It follows from the settlement referred to that the parties to the settlement are jointly and severally liable *for* specified amounts paid to each pension plan. The

Danish Customs and Tax Administration's deduction from the claim against Bech-Bruun was therefore based on the extent to which the payments from the parties to the settlement can be allocated proportionately to the pension plans that have used dividend credit advice slips from North Channel Bank and not on the basis of what has been paid *by* the individual pension plan.

The Supreme Court finds that, in the present situation, it was well-founded that the Danish Customs and Tax Administration entered into the settlements in question, including the settlement of 28 May 2019, and that, in the circumstances of the case, the Danish Customs and Tax Administration was entitled to deduct the payments made by the parties to the settlement.

*7. Contributory negligence and assumption of risk*
The Supreme Court finds that there are no circumstances to justify Bech-Bruun's liability to lapse or be limited on grounds of contributory negligence or assumption of risk.

*8. The size of the Danish Customs and Tax Administration's claim*

On the basis of the above regarding the basis of liability, causation, statement of loss, contributory negligence and assumption of risk, the Danish Customs and Tax Administration's claim against Bech-Bruun is calculated at DKK 705,821,108.92 in accordance with the Danish Customs and Tax Administration's Claim 1.

On the basis of what is stated in section 5 above about reasonable foreseeability, the Supreme Court finds that Bech-Bruun's liability, based on an overall assessment, should only include an amount of DKK 400 million.

*9. Time-barring*
The Supreme Court finds that the limitation period did not run from the dates of the Danish Customs and Tax Administration's payments to the pension plans (the occurrence of the damage), see section 2(4) of the Danish Limitation Act. The limitation period was thus suspended and would then only run from the time when the Danish Customs and Tax Administration became aware or should have become aware of the claim or the debtor.

The Danish Customs and Tax Administration brought the action on 8 June 2020 and the decisive question is therefore whether the suspension of the limitation period had expired on 8 June 2017, since the Danish Customs and Tax Administration's claim would then be time-barred when the action was brought on account of the three-year limitation period.

Bech-Bruun has argued, in particular, that the suspension of the limitation period ended with the e-mail of 10 October 2016 received by the Danish Customs

and Tax Administration from the German authorities. The Supreme Court finds that, on the basis of the content of the e-mail in question, the Danish Customs and Tax Administration was not aware or should have been aware that Bech-Bruun was responsible for causing the damage (debtor), see section 3(2) of the Danish Limitation Act.

Nor does the Supreme Court find that there are any other circumstances that might justify the suspension of the limitation period having ended on 8 June 2017. Thus, the Danish Customs and Tax Administration's claim against Bech-Bruun was not time-barred when the action was brought on 8 June 2020.

*10. Interest*

The Supreme Court finds that there is no basis for interest on the Danish Customs and Tax Administration's claim from an earlier or later date than the day on which the case was brought, see section 3(2), (4) and (5) of the Danish Interest Act, or for interest to accrue at a lower interest rate, see section 5(3), of the Act.

Interest on the Danish Customs and Tax Administration's claim shall thus accrue from the date on which the action was brought on 8 June 2020.

*11. Overall conclusion*

Bech-Bruun shall pay DKK 400 million to the Danish Customs and Tax Administration plus statutory interest from 8 June 2020. The Supreme Court thus partially allows the Danish Customs and Tax Administration's Claims 1 and 3 and dismisses the Danish Customs and Tax Administration's Claim 2 against Bech-Bruun.

Furthermore, the Supreme Court allows the Danish Customs and Tax Administration's Claim 4 for reimbursement of legal costs before the High Court.

*12. Legal costs*

According to the nature, scope and outcome of the case, the Supreme Court finds that Bech-Bruun shall pay partial legal costs before the High Court and the Supreme Court of a total of DKK 12,394,000 to the Danish Customs and Tax Administration. DKK 12 million of this amount shall cover legal expenses and DKK 394,000 the court fee.

## IT IS HELD THAT:

Bech-Bruun I/S shall pay DKK 400,000,000 to the Danish Customs and Tax Administration plus statutory interest from 8 June 2020.

Bech-Bruun I/S shall repay to the Danish Customs and Tax Administration DKK 6,189,953.70 with statutory interest from 24 May 2022.

In legal costs before the High Court and the Supreme Court, Bech-Bruun I/S shall pay to the Danish Customs and Tax Administration DKK 12,394,000.

The legal costs ordered shall be paid within 14 days after the delivery of this Supreme Court judgment.

The legal costs shall accrue interest pursuant to section 8 a of the Danish Interest Act.